OWENS, APPELLANT, *v.* BELL, APPELLEE.

[Cite as Owens *v.* Bell (1983), 6 Ohio St. 3d 46.]

(No. 82-1244—Decided July 20, 1983.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Gary W. Johnson,* for appellant.

*Mr. Avery I. Becker,* for appellee.

HOLMES, J. Subsequent to the trial of this matter, the General Assembly determined that it is the public policy of this state to accept the reliability of Human Leukocyte Antigen testing as a positive indicia of the probability of paternity. Therefore, this case only presents the question of whether such test results, prior to the enactment of R.C. 3111.09 and 3111.10, should have been admitted upon the issue of probability of paternity.[1] We answer this question in the affirmative.

As stated, the sole issue raised by this appeal is whether R.C. 2317.47 and former R.C. 3111.16 would, in matters originating prior to current law, have precluded the admission of HLA test evidence which did not exclude the putative father. In pertinent part, R.C. 3111.16 provided:

"Whenever it is relevant to the defense in a paternity proceeding under sections 3111.01 to 3111.24 of the Revised Code, the trial court, on motion of the defendant, shall order that the complainant, her child, and the defendant submit to one or more blood-grouping tests to determine whether, by the use of such tests, the defendant can be determined not to be the father of the child. * * * In cases where exclusion is established, the results of the tests

---

[1] R.C. 3111.09 and 3111.10, enacted effective June 29, 1982, recognize HLA as one of the "genetic tests" that may be utilized in an action to determine paternity, and permit the results of such tests to be adduced upon the issue of the probability of paternity. These sections, in pertinent part, provide:

R.C. 3111.09 (genetic tests):

"(A) In any action instituted under this chapter, the court may, upon its own motion or upon the motion of any party to the action that is made at a time so as not to unduly delay the proceedings, order the child's mother, the child, the alleged father, and any other person who is a defendant in the action to submit to genetic tests. * * *

"* * *

"(E) As used in this chapter, 'genetic tests' means a series of serological tests, that are either immunological or biochemical or both immunological and biochemical in nature, and that are specifically selected because of their known genetic transmittance. 'Genetic tests' include, but are not limited to, tests for the presence or absence of the common blood group antigens, the red blood cell antigens, human lymphocyte antigens, serum enzymes, and serum proteins."

R.C. 3111.10 (evidence of paternity):

"In an action brought under this chapter, evidence relating to paternity may include:

"* * *

"(C) Genetic test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity; * * *"

together with the finding of the expert of the fact of nonpaternity shall be receivable in evidence. * * *"

R.C. 2317.47 contains basically the same language limiting the admission of blood grouping test results to those cases where exclusion is shown, but is applicable to any civil or criminal proceeding.[2]

In the passage of such statutes, the General Assembly was basically in concert with the legislative bodies of other states in the view that there was more than a modicum degree of fallibility in the blood grouping tests that generally had been used for a number of years in proving paternity. Before HLA tests, six red cell blood grouping tests were available for use in determining paternity (or, more precisely, nonpaternity): ABO, MNSs, Rh, Kell, Duffy and Kidd.[3] These tests analyze a very limited number of factors and, when used in combination, the mean probability of excluding a non-father is between sixty-three and seventy-two percent.[4]

When HLA testing is used in concert with these tests, the mean probability of excluding a non-father is raised to at least ninety percent.[5] Use of the tests, other than HLA, is not permitted in most states to prove, as opposed to disprove, paternity.[6]

The HLA testing procedure is not the typical test based upon red blood cell groupings such as those referred to and previously in common use in Ohio and throughout the country to exclude men from parentage. The HLA is based upon tissue typing of the white blood cells. In deciding that such tests were admissible on the question of paternity in California, which had a

---

[2] R.C. 2317.47 states:

"Whenever it is relevant in a civil or criminal action or proceeding to determine the paternity or identity of any person, the trial court on motion shall order any party to the action and any person involved in the controversy or proceeding to submit to one or more blood-grouping tests, to be made by qualified physicians or other qualified persons not to exceed three, to be selected by the court and under such restrictions or directions as the court or judge deems proper. In cases where exclusion is established, the results of the tests together with the findings of the experts of the fact of nonpaternity are receivable in evidence. Such experts shall be subject to cross-examination by both parties after the court has caused them to disclose their findings to the court or to the court and jury. Whenever the court orders such blood-grouping tests to be taken and one of the parties refuses to submit to such test, such fact shall be disclosed upon the trial unless good cause is shown to the contrary. The court shall determine how and by whom the costs of such examination shall be paid."

[3] The Landsteiner classification of blood grouping tests has been in general use for a number of years. For descriptions of the various types of blood grouping tests and assessments of their reliability, see McCormick, Handbook of the Law of Evidence (2 Ed. 1972 and 1978 Supp.), Section 211; see, also, Annotation (1946), 163 A.L.R. 939; and Annotation (1956), 46 A.L.R. 2d 1000.

[4] Miale, Jennings, Rettberg, Sell & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage (1976), 10 Fam. L. Q. 247, 256.

[5] *Id.*

[6] Page-Bright, Proving Paternity — Human Leukocyte Antigen Test (1982), 27 J. Forensic Sciences 135, 138.

similar statute as Ohio, limiting test evidence to exclude paternity, a California appellate court, in *Cramer* v. *Morrison* (1979), 88 Cal. App. 3d 873, 878, 153 Cal. Rptr. 865, 867, Justice Tamura writing, explained the test as follows:

"* * * The test has gained wide acceptance for kidney transplantation and is universally used for that purpose in the United States and Europe. There is a great difference between red blood cell testing and HLA tissue typing. Red blood cell grouping involves only a small number of variables or factors, so that while a man may be conclusively ruled out as a father on the results of such tests, proof that he *is* the father is very inconclusive, ordinarily involving only a 50 to 60 percent probability that the man is the father. HLA testing, on the other hand, involves a much larger number of factors, antigens in the white blood cells, so that proof of parentage is much more conclusive, usually involving a 98 percent probability that the man is the father."[7]

The significance of the development of HLA test results for evidence within disputed parentage cases may be found within Miale, Jennings, Rettberg, Sell & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage (1976), 10 Fam. L. Q. 247, where, at page 283, it is stated:

"* * * It is recommended that steps be taken to obtain such Federal, State, or other support as to enable widespread inclusion of HLA studies in the battery of tests used in cases of disputed parentage. * * *"

A number of states, prior to Ohio's legislation, in acceptance of HLA as a testing procedure, enacted statutes which permitted the introduction of the results of such tests to prove parentage.[8]

A rather extensive number of authors had, prior to the adoption in 1982 of R.C. 3111.09 and 3111.10, written articles and commentary on the advanced technique of determining paternity through the use of HLA tests. See, *e.g.*, Polesky & Krause, Blood Typing in Disputed Paternity Cases — Capabilities of American Laboratories (1976), 10 Fam. L. Q. 287; Terasaki, Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing (1977-1978), 16 J. Fam. L. 543. In reference to this latter article, it

---

[7] For further discussion of HLA procedure and reliability, see Schatkin & Gaffner, 1 Disputed Paternity Proceedings (4 Ed. 1982 Supp.), at page 104; see, also, Larson, Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond (1973-1974), 13 J. Fam. L. 713, 744-748.

[8] Ariz. Rev. Stat. Ann. 12-847 (1982); Colo. Rev. Stat. 1973 Ann. 13-25-126 (1982 Cum. Supp.); Ga. Code Ann. 74-307 (1982 Cum. Supp.); Ill. Ann. Stat. Ch. 40, Paragraph 1401, Section 1 (1982-1983 Cum. Supp.); Ind. Code 31-6-6.1-8 (1981 Cum. Supp.); Ky. Rev. Stat. Ann. 406.111 (1970); La. Rev. Stat. Ann 9:396 (1983 Cum. Supp.); Me. Rev. Stat. Ann. Title 19, Section 280 (1981 Ed.); N.D. Cent. Code Ann. 14-17-11 (1981); Ore. Rev. Stat. 109.258 (1977-1978 Repl.); Utah Code Ann. 7B-45a-10 (1977 Repl.); Va. Code 20.61.2 (1982 Cum. Supp.); Rev. Code of Wash. Ann. 26.26.110 (1983-1984 Cum. Supp.); and Wyo. Stat. Ann. 14-2-110(a) (iii) (1977 Ed.).

should be pointed out that the author, Dr. Paul I. Terasaki, B.A. 1950, M.A. 1952, Ph.D. 1956, Professor of Surgery, UCLA, member of editorial boards of several scientific journals including the Journal of Immunogenetics, is an internationally recognized authority on histocompatibility immunology and has written over three hundred fifty papers on HLA.[9]

In resolving the issue raised by this appeal, we must answer two questions: first, whether prior to the enactment of R.C. 3111.09 and 3111.10, HLA testing results were prohibited as evidence to establish paternity by virtue of R.C. 3111.16; and second, if the first question is resolved in the negative, whether HLA testing procedures had advanced technically to the point that their scientific credibility was generally approved and, as such, whether these test results passed muster as being of bona fide probative value.

We answer the first question set forth above in the negative, and respond positively to the second.

There are a number of basic reasons for our conclusion that R.C. 3111.16 would not have precluded the introduction of HLA test reports in these types of cases in proof of paternity. First, the section refers to blood grouping tests, while HLA has generally been referred to as a tissue typing test and, even though the test is performed upon a portion of the blood, i.e., the white cells, it is not technically a blood grouping test. In this regard, it is notable that in the AMA-ABA Guidelines, supra, at pages 263-274, the six tests other than HLA are referred to as "blood group systems" and the HLA test is not.

One of the leading cases dealing with the admissibility of HLA tests to establish paternity, where there was the existence of a state law providing that blood tests may only be used as an exclusionary factor, was Cramer v. Morrison, supra. In such case, Justice Tamura stated, at pages 880-882:

"In our opinion, the drafters of the Uniform Act did not have in mind tests of the nature of the HLA. * * * The Landsteiner series enjoyed currency when the uniform act was adopted in California. * * * As Dr. Terasaki's testimony shows, the HLA test is not one of the Landsteiner series, nor is it even a red blood cell blood grouping test. It involves tissue typing of the white blood cells and results in far higher probabilities of paternity than those yielded by any of the blood grouping tests."

The same conclusions as reached by the California court in this regard may be applied here. The HLA testing procedures had not as yet acquired a legally acceptable status when R.C. 2317.47 and 3111.16 were enacted into law by the General Assembly. We may reasonably conclude that the General Assembly had not considered HLA at that time and, accordingly, that it was not the legislative intent to deny the use of these tissue typing genetic test results in legal proceedings.

Having found that the introduction of evidence relating to HLA tests

---

[9] See, also, Mendelson, From Here to Paternity (Winter 1982), 9 Barrister No. 1, 12, at page 14.

would not be contrary to statute, the question becomes whether such evidence is relevant. In Evid. R. 401, the definition of "relevant evidence," is:

"* * * evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evid. R. 402, relative to admissibility, is that:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible."

In *Cramer* v. *Morrison, supra,* the court, in determining that HLA test results constituted relevant evidence, stated, at page 884, in the opinion:

"* * * The HLA test interpretations are not based on arbitrarily assigned numerical probability values or on a statistical theory unsupported by the evidence. Instead, they are based upon objectively ascertainable data and a statistical theory based upon scientific research and experiment. The results established a 98.3 percent probability that defendant was the father of the child. As the court aptly stated in *People* v. *Slone* [1978], 76 Cal. App. 3d 611, 625 [143 Cal. Rptr. 61, 70], in upholding the admissibility of a recently developed technique of bite mark identification, '[t]here is a probability factor in even the most carefully structured scientific inquiry; seldom is it possible to exclude all possible chance for error in human endeavor. But there is no requirement in our law that the admissibility of scientific-test evidence must be predicated on a 100 percent degree of accuracy.' "

This court recently reviewed the question of the admissibility of scientific evidence in *State* v. *Williams* (1983), 4 Ohio St. 3d 53, wherein the court held as follows:

"The Ohio Rules of Evidence establish adequate preconditions for admissibility of expert testimony, such as spectrographic voice analysis. It is within the sound discretion of the state's judiciary, on a case by case basis, to decide whether such testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue."

Accordingly, we hold that the admission of the HLA test interpretations would be relevant and would, in the language of the Ohio Rules of Evidence, have a tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. We conclude that such evidence will assist the trier of the fact to understand the evidence or to determine a fact in issue.

There appear to be a significant number of articles and cases which set forth the scientific acceptance of HLA testing procedures, some of which have been mentioned *supra.* In addition to the California courts, other state courts have recognized the scientifically advanced status of these tests. In *Jane L.* v. *Rodney B.* (Fam. Ct. 1981), 108 Misc. 2d 709, 712, 438 N.Y. Supp.

2d 726, 728, in upholding the constitutionality of the HLA amendment in that state, the court stated:

"* * * In contrast to previous test methods, which afforded only a 75% possibility of excluding a falsely accused man, the HLA and adjunct blood grouping tests establish, according to unanimous expert opinion, a 91 to 98% probability that a man who tests as a possible father is in fact the father (the difference in percentage depending on how many related blood group systems are used besides HLA itself). (See Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam. L. Q. 247, 257 [1976])."

The Supreme Court of Washington, in *State* v. *Meacham* (1980), 93 Wash. 2d 735, 738, 612 P. 2d 795, 797, stated that:

"No other evidence that is at all comparable in effectiveness is available * * *" to prove paternity.[10]

Dr. Paul I. Terasaki, noted in his work, Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing, *supra,* that:

"A revolution in paternity testing is currently underway with the introduction of HLA testing. The HLA system of tissue types is so powerful in determining the probability of paternity that many of the older rules of evidence for blood tests in disputed paternity cases now require complete revision.

"Generally, it has been assumed by American courts that blood testing is only valid for exclusion of paternity. This conclusion is based on the fact that when the putative father is not excluded by ABO testing, his chances of actually being the father are not usually high. Thus, for purposes of blood test evidence, any random male could have been the father almost as easily as the nonexcluded putative father. With HLA testing, the probability of a nonexcluded male being the actual father is usually over 90%."

We find in Page-Bright, Proving Paternity — Human Leukocyte Antigen Test (1982), 27 J. Forensic Sciences 135, 150, the following conclusion, in pertinent part:

"* * * The legal profession's use of such vital scientific evidence in litigating paternity disputes would lend the proceeding much more credibility and reliability and provide a more efficient method of reaching the truth."[11]

---

[10] See, also, *Edward K.* v. *Marcy R.* (Fam. Ct. 1980), 106 Misc. 2d 506, 434 N.Y.Supp. 2d 108; *State, ex rel. Ortloff,* v. *Hanson* (Minn. 1979), 277 N.W. 2d 205; *J. H.* v. *M. H.* (1980), 177 N.J. Super. 436, 426 A. 2d 1073.

[11] The omitted portion of this conclusion is as follows:

"The HLA test, performed in conjunction with other blood tests as recommended by the AMA and ABA, has demonstrated its ability to raise the mean probability of excluding a putative father to at least the 90% level. As the percentage of exclusion approaches 100% with the HLA test, so the scientific ability to calculate the likelihood of an alleged father being the actual father increases. The question of paternity must be dealt with empirically. Our legal system must be more receptive to the reliability of the HLA test results and allow them into evidence. Where the test results indicate the possibility of an alleged father's paternity, the degree of

We hold that there were, prior to the enactment of the enabling statute in Ohio, sufficient articles, commentary and case law to show the scientific accuracy and reliability of HLA testing results. The validity of HLA tissue typing as an effective means of establishing paternity exclusion and inclusion with a high degree of conclusiveness was, and is, being more widely accepted in medical and legal circles, as later evidenced by the enabling act being passed in Ohio.

Concluding, we hold that the Human Leukocyte Antigen (HLA) tests are basically genetic comparison examinations, rather than blood grouping tests as described in R.C. 2317.47 and 3111.16 and, as a result, they are relevant to the determination of paternity and would therefore have been admissible for such purpose even prior to the enactment of R.C. 3111.09 and 3111.10, which now permit the admission of HLA test results to establish the probability of paternity.

Based on all of the foregoing, the judgment of the court of appeals is reversed.

*Judgment reversed.*

W. BROWN, SWEENEY, LOCHER and J. P. CELEBREZZE, JJ., concur.

CELEBREZZE, C.J., and O'NEILL, J., concur separately.

O'NEILL, J., of the Seventh Appellate District, sitting for C. BROWN, J.

CELEBREZZE, C.J., concurring. Although I concur in the syllabus and judgment as expressed in the majority opinion, I am compelled to write separately to allay some concern that the bench and bar may have with the majority opinion.

The facts of the case at bar indicate that a party to a civil action underwent a physical examination in preparation for trial. The examination turned out to be unfavorable to that party and the results were sought to be admitted into evidence by the opposing party. Today's decision permits the results of the examination to be admitted into evidence. However, this case should not be interpreted to stand for the proposition that any time a party to a civil action consults with an expert prior to trial but does not intend to call that expert as a witness, the opposing party may discover the identity of the expert or the expert's findings or opinions and subsequently seek to introduce either at trial. Such situations are governed by the following Rules of Civil Procedure. Civ. R. 26(B)(4)(a) provides:

---

probability should be allowed into evidence and considered along with other traditional evidence. When the test results exclude a puntative [*sic*] father, the results should operate as conclusive evidence of nonpaternity. * * *"

See, also, Protogere, Use of Human Leukocyte Antigen Test Results to Establish Paternity (1981), 14 Ind. L. Rev. 831.

"Subject to the provisions of subdivision (B)(4)(b) of this rule and Rule 35 (B), a party may discover facts known or opinions held by an expert retained or specially employed by another party in anticipation of litigation or preparation for trial only upon a showing that the party seeking discovery is unable without undue hardship to obtain facts and opinions on the same subject by other means or upon a showing of other exceptional circumstances indicating that denial of discovery would cause manifest injustice."

In addition, Civ. R. 35 states in part:

"(A)  Order for examination. When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit himself to a physical or mental examination or to produce for such examination the person in the party's custody or legal control. * * *

"(B)  Examiner's report. (1) If requested by the party against whom an order is made under Rule 35(A) or the person examined, the party causing the examination to be made shall deliver to such party or person a copy of the detailed written report submitted by the examiner to the party causing the examination to be made. The report shall set out the examiner's findings, including results of all tests made, diagnoses and conclusions, together with like reports of all earlier examinations of the same condition. After delivery, the party causing the examination shall be entitled upon request to receive from the party against whom the order is made a like report of any examination, previously or, thereafter made, of the same condition, unless, in the case of a report of examination of a person not a party, the party shows that he is unable to obtain it. The court on motion may make an order against a party to require delivery of a report on such terms as are just. If an examiner fails or refuses to make a report, the court on motion may order, at the expense of the party causing the examination, the taking of the deposition of the examiner if his testimony is to be offered at trial."

Thus, Civ. R. 26 (B)(4)(a) allows for the discovery of experts consulted for trial preparation only upon a showing of "undue hardship" or "exceptional circumstances" while Civ. R. 35 permits discovery of physical or mental examinations conducted prior to trial if the examinations conducted were ordered by the court or made by agreement of the parties. Other than in those situations covered by these two rules, it would appear that the identity of experts consulted prior to trial but who will not be called as witnesses as well as the findings or opinions of those experts are not subject to discovery by the opposing party.

Finally, I must emphasize that the upshot of the majority opinion is simply that, insofar as relevance under Evid. R. 401 is concerned, HLA testing is relevant to a determination of paternity and was not barred by any legislation in effect prior to June 29, 1982.

Accordingly, for the foregoing reasons I likewise would reverse the decision of the court of appeals below.

O'NEILL, J., concurs in the foregoing concurring opinion.